Charles Thomas STILES, petitioner, Appellant,

v.

COMMISSIONER OF PUBLIC SAFETY, Respondent.

No. C5–84–1749.

Court of Appeals of Minnesota.

June 18, 1985.

Alan R. Nettles, Carrie L. Hess, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Joel Watne, Donald J. Paquette, Sp. Asst. Attys. Gen., St. Paul, for respondent.

Heard, considered, and decided by RANDALL, P.J., and SEDGWICK and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

Appellant Charles Thomas Stiles appeals the trial court's sustaining of revocation of Stiles' driver's license after he refused to submit to testing pursuant to Minn.Stat. § 169.123 (Supp.1983). On appeal, Stiles argues: (1) lack of probable cause to invoke the Implied Consent Statute; (2) denial of his limited right to counsel; and (3) denial of due process. We reverse.

## FACTS

On June 2, 1984 Stiles, while riding a motorcycle, grazed a raised curb on a highway entrance ramp, hit the curb again, and flipped over into a gully. He asserts he lost control of the motorcycle because the drive chain slipped, causing the rear wheel to jam.

Directly following the accident, Stiles had a seizure and became unconscious. He was promptly taken by ambulance to a hospital emergency room. The emergency room attending physician indicated that upon admittance Stiles was "oriented only to person" and was "repeating the same question over and over again." He had sustained a concussion, a collapsed lung, a broken clavicle, a pelvis broken in four places, and broken ribs. The extent of his injuries was such that Stiles was hospitalized for two months after the accident.

Police Officer Roger Laurence arrived at the scene a few minutes after the accident. The ambulance crew was already attending to Stiles, and Laurence did not have any contact with him at that time. Before Laurence left the scene, he interviewed one witness, Jenny Sheer. Sheer did not testify at the revocation hearing. Laurence testified at that hearing that Sheer, a nurse aide, told him that, while administering first aid to Stiles, he seemed impaired by drugs or alcohol, that his eyes appeared spacy and glassy, and that Sheer noticed a mild odor of alcohol on Stiles' breath. Laurence also testified that Sheer informed him that she observed Stiles look both right and left on the entrance ramp, and that she thought at the time that it was odd that he had done so.

Another witness to the accident, Eugene Harrison, is a former military police officer with experience assisting at and investigating serious traffic accidents. Harrison was in close contact with Stiles after the accident, assisting the ambulance crew. At the revocation hearing, Harrison testified that he observed no odor of alcohol on Stiles' breath or other indicia of alcohol consumption. Harrison also testified that, based upon his experience with accident victims suffering internal injuries, he attributed Stiles' physical symptoms at the accident scene to what appeared to him to be serious internal injuries. Harrison further testified that he observed prior to the accident that Stiles was driving at a normal speed and in an orderly fashion.

At the hospital, the physician attending Stiles did not allow Laurence to speak to Stiles until approximately 45 minutes after the accident. At that time Stiles was strapped to an emergency room table with an I.V., a gastric tube inserted through his nose, down his esophagus and into his stomach, another tube inserted into his chest, and a catheter inserted into his bladder. Stiles was also receiving oxygen and was attached to various monitoring devices as well.

Laurence testified at the revocation hearing that at a distance of three feet from Stiles in the emergency room he noticed a "strong" odor of alcohol. Laurence also testified that Stiles was disoriented, that his eyes were reddened and glassy, that his breathing was labored, that his speech was slurred, that he spoke with difficulty, and in a faint, whispery voice.

After Laurence formed an opinion that Stiles was under the influence of alcohol, Laurence read the implied consent advisory to Stiles. When Laurence asked Stiles if he understood the advisory, Stiles said no. Laurence immediately read the advisory a

second time and again asked Stiles if he understood it. This time Stiles said yes. Laurence then proceeded with a full reading of the advisory. During this time, the emergency room medical staff continued to administer medical treatment to Stiles.

When asked if he wanted to speak to an attorney during the second reading of the advisory, Stiles indicated that he did. When asked if he had a particular attorney he wanted to call, Stiles said no. The record reflects that Stiles had a specific attorney whom he had consulted regarding two previous DWI's. After Stiles indicated that he wanted to talk to an attorney, Laurence determined that the nearest phone was twenty feet away from Stiles. The attending physician informed Laurence that Stiles could not be moved to the phone. Subsequently, Laurence consulted with his supervisor by phone. He then resumed reading the advisory, and made no further effort to facilitate or assist Stiles in vindicating his right to counsel.

When Laurence asked Stiles if he would submit to testing, Stiles said no. When Laurence asked Stiles why he refused, Stiles didn't answer. Upon prompting by Laurence that his refusal was because of prior DWI's, Stiles replied yes.

Stiles' mother arrived at the hospital about twenty minutes after Laurence had completed reading the advisory to Stiles. At the revocation hearing, Stiles' mother testified that when she arrived at the hospital Stiles kept repeating over and over to her, "I'm dying, Mom." Laurence did not request the assistance of Stiles' mother in vindicating Stiles' right to counsel nor at any time did Laurence approach the hospital staff to assist Stiles.

Stiles' driver's license was revoked on the basis of his refusal to submit to testing pursuant to Minn.Stat. § 169.123. The trial court sustained the revocation, holding: (1) that Laurence had probable grounds to believe that Stiles had been driving a motor vehicle while under the influence of alcohol in violation of Minn.Stat. § 169.121 (Supp. 1983); (2) that inasmuch as Stiles was physically and mentally incapable of using a

phone or meaningfully consulting with an attorney, Laurence's behavior did not constitute a denial of Stiles' vindication of his limited right to counsel; and (3) that the issue whether Stiles had the capacity to make a knowing, voluntary or intelligent choice to refuse the test due to his injuries was irrelevant pursuant to *Rude v. Commissioner of Public Safety*, 347 N.W.2d 77 (Minn.Ct.App.1984). From this order Stiles now takes appeal.

## ISSUES

1. Is the evidence in this case sufficient to sustain a finding that the peace officer had probable cause to believe appellant had been driving while under the influence of alcohol?

2. Under the particular facts of this case, should the officer who unqualifiedly had concluded that the driver was disoriented have deemed the driver's consent to have been continuing and ordered that a test be taken?

## ANALYSIS

1. Stiles asserts that his symptoms of disorientation, reddened and glassy eyes, and difficulty speaking were a result of the serious injuries he incurred in the accident, and not indicia of intoxication. He argues that the only indicia of intoxication was the purported odor of alcohol, and this standing alone does not constitute probable cause to invoke the implied consent law.

This court does not conduct a de novo review of an officer's probable cause determination. *State v. Olson*, 342 N.W.2d 638, 641 (Minn.Ct.App.1984). Probable cause is to be evaluated from the point of view of the particular situation confronting that officer. *Id.* at 640. The officer's task is to make a practical common-sense decision in light of all the circumstances. *Id.* An officer may consider behavior which may later be shown to have exculpatory explanations when assessing the totality of circumstances and making a probable cause determination. *Id.* Thus, even if there are valid alternative explanations for

Stiles' physical symptoms, it was not improper for Laurence to consider these symptoms when he made his probable cause determination in this fact situation. *Id.*

■ Furthermore, depending upon the circumstances, even a single objective indication of intoxication may constitute sufficient probable cause for a peace officer to believe a person is under the influence of alcohol pursuant to the Implied Consent Statute. *Martin v. Commissioner of Public Safety*, 353 N.W.2d 202, 204 (Minn.Ct. App.1984) (citing *Holtz v. Commissioner of Public Safety*, 340 N.W.2d 363 (Minn.Ct. App.1983)).

■ Here, the peace officer and one witness observed an odor of alcohol on Stiles' breath. Additionally, other physical indicia which may or may not be attributed to alcohol consumption were also observed. These observations were noted after the occurrence of a serious single vehicle accident in which Stiles as the driver lost control of his motorcycle for no immediately apparent reason.

Based upon the totality of these circumstances confronting Laurence, this court concludes that he had probable cause to determine that Stiles was under the influence of alcohol in violation of state law.

2. Next, Stiles argues that he was denied due process when his license was revoked on the basis of a refusal given when, in fact, his injuries prevented him from giving a valid refusal.[1] This issue is a troubling one.

The testimony is uncontroverted that Stiles was disoriented during Laurence's reading of the advisory. Stiles' internal injuries were serious. At the scene of the accident, he had a seizure and lost consciousness. When Laurence began reading the advisory, Stiles had only been conscious for a comparatively short period of time. He was strapped to an emergency room gurney and encumbered by numerous tubes, needles, monitors, and breathing apparatus. The result of Stiles' injuries and the treatment provided left him in shock and in great pain, capable of speaking only with difficulty in a faint whisper. Stiles indicated initially that he did not understand the advisory being read to him.

This court has recently addressed the issue of what effect the capacity of an injured or disabled driver to knowingly refuse to take the chemical test has upon license revocation. In *Rude v. Commissioner of Public Safety*, 347 N.W.2d 77 (Minn.Ct.App.1984), the injured driver never expressed any confusion at the time the implied consent advisory was read to her. She refused to take the test and her license was revoked. At the hearing on that revocation, the detective who had read the implied consent advisory testified that Rude appeared to be attentive during the reading. An attending physician testified that Rude was confused and disoriented due to her trauma. Rude argued at the hearing that she did not have the capacity to make a reasonable decision about the test. The trial court agreed that her condition was such that she could not knowingly or intelligently refuse the test and rescinded the license revocation. This court reversed the trial court, stating:

> In recent years, the implied consent statute has been strictly applied in a series of cases raising questions which, though possessing a certain plausibility, were contrary to the purpose and policy of the statute. In *State, Dept. of Public Safety v. Hauge*, 286 N.W.2d 727 (Minn.1979), the Supreme Court reversed decisions of the county and district courts, which had found a driver unable to give "knowing" consent due to his injuries and the effects of novocaine administered prior to stitching up his head wounds. The last sentence of the opinion seems to end the inquiry: "Under the implied consent statute, any inquiry into the driver's *capaci-*

---

1. The Commissioner argues that the due process issue is not properly before this court because the Attorney General was not notified of Stiles' intention to test the constitutionality of the stat-

ute. However, it is the application of the case law which is being challenged here, not the statute itself, and we shall address the due process issue.

*ty* to make a knowing, voluntary, or intelligent *choice* is immaterial." *Id.* at 728 (emphasis added).

Although this language is dictum, cases subsequently decided have put to rest most controversies arising under the statute. *See State, Dept. of Public Safety v. Wiehle,* 287 N.W.2d 416 (Minn.1979) (presumed consent valid even though unconscious driver was unable to consent at the time of testing); *State v. Hart,* 289 N.W.2d 478 (Minn.1979) (test admissible even though implied consent advisory form never read).

*Id.* at 80.

■ The Commissioner urges that *Rude* is controlling in this case. Indeed, the trial court deemed it to be. We decline, however, to extend the ruling of *Rude* to the facts now before us. The detective in *Rude* made a good faith determination that the injured driver was attentive and not disoriented. He so testified. Here, the uncontradicted testimony of the arresting officer was that Stiles was disoriented. Unquestionably, his physical injuries were substantial. Under the particular facts of this case, we are left with a firm conviction that the officer, having determined that Stiles was disoriented, should have deemed his implied consent to have been continuing and ordered a test.

We believe such action by the arresting officer would have been wholly consistent with the decisions of the Minnesota Supreme Court in *State, Department of Public Safety v. Wiehle,* 287 N.W.2d 416 (Minn. 1979) and *State, Department of Public Safety v. Hauge,* 286 N.W.2d 727 (Minn. 1979). In *Wiehle,* the implied consent advisory was not read to an injured, unconscious driver. A blood test was taken. On appeal, the Supreme Court affirmed the revocation of Wiehle's license on the basis of that test, noting that Wiehle's physical condition precluded him from refusing a test and his consent was deemed to be continuing.

In *Hauge,* the implied consent advisory was read to an injured driver, he consented to a test, one was taken, and his license was revoked as a result. At the hearing, the trial court rescinded the revocation, ruling that "the accident and ensuing medical treatment had rendered him incapable of understanding his rights or knowingly exercising them." *Hauge* at 728. The Supreme Court reversed, citing *Wiehle,* and held that Hauge's statutorily-implied consent remained continuing.

Had the arresting officer here ordered a test after determining that Stiles was disoriented, the Commissioner could have offered that test result into evidence pursuant to the authority of *Wiehle* and *Hauge.* Such a test would almost certainly have been far less intrusive for Stiles than was the reading of the implied consent advisory at a time when his mind was disoriented and his body encumbered by various tubes, catheters, monitors, and oxygen equipment.[2] *See Schmerber v. State of California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The officer chose instead to rely on the refusal of Stiles, whom the officer had unqualifiedly determined to be disoriented. Under circumstances such as these, such reliance raises the possibility that an injured driver, even though driving legally, could lose his or her license merely because of a test refusal uttered while in a disoriented state. We do not believe that *Wiehle* or *Hauge* mandate encountering such a risk.

Further, we believe that our determination here is consistent with the decision of the Minnesota Supreme Court in the recent case of *Tyler v. Commissioner of Public*

---

2. The trial court, in commenting on Stiles' physical circumstances as they related to vindication of his limited right to counsel, observed:
   [I]t is apparent that the accident rendered [Stiles] mentally incapable of consulting with his attorney (in fact, [Stiles] even represented that he did not have an attorney) and of making a knowing, voluntary, and intelligent choice to refuse testing. * * * [The officer] could have brought telephone books into the critical care room and told [Stiles] that he may use the books and the telephone on the wall. However, this would have been an empty gesture given [Stiles'] physical and mental condition.

*Safety*, 368 N.W.2d 275 (Minn.1985). In *Tyler*, the court declared that blood test results could not be used to sustain a license revocation when the implied consent advisory had not been read to the driver prior to taking the test. (The court determined that those results were, however, admissible in the DWI criminal proceedings.) The *Tyler* court noted:

> It would be improper and unfair to revoke a driver's license for refusing to take a test if an advisory were not given. * * * [The advisory] is aimed at letting a driver know the serious consequences of his refusal to take a test. * * * If he had not taken a test, he would be subject to a longer revocation. * * * [W]e believe that the legislature intended that a driver's license be revoked pursuant to the implied consent law for driving with a blood alcohol concentration of .10 or more only if the provisions of the law were complied with by the police.

There was no indication that Tyler was unconscious, disoriented, or otherwise lacked capacity to understand the implied consent advisory.

The court in *Hauge*, where a test was made, notes in dicta that inquiry into the capacity to make a choice (as to testing) is immaterial. *Tyler*, however, stresses the necessity of informing a driver of the serious consequences of refusal to take a test. We do not deem these statements to be contradictory. Wiehle was unconscious. The *Wiehle* court noted that an unconscious person could not respond to advisory information and found failure to read the implied consent advisory not improper. Tyler was not unconscious or disoriented. There, failure to read the implied consent advisory was fatal.

Pursuant to *Tyler*, Stiles had a right to know the serious consequences of refusal to take a test. However, Stiles, as Wiehle, was incapable of understanding that right. The officer should have observed the procedures followed in *Wiehle* and ordered a test.

Finally, we note that Minn.Stat. § 169.-123, subd. 2(c) (1984), effective some 80 days after the events here and applicable to all offenses committed on or after August 31, 1984, addresses the concerns now before this court. It reads:

> **Consent of person incapable of refusal not withdrawn.** A person who is unconscious or who is otherwise in a condition rendering the person incapable of refusal is deemed not to have withdrawn the consent provided by subdivision 2 and the test may be given.

*Id.*

In view of our decision regarding Stiles' "refusal" to take a test, we do not reach his allegations regarding vindication of his limited right to counsel before testing.

### DECISION

The evidence is sufficient to sustain the trial court's finding that the peace officer had probable cause to believe appellant had been driving under the influence of alcohol.

Under the particular facts of this case, the officer who had unqualifiedly concluded that the driver was disoriented should have deemed the driver's consent to have been continuing and ordered that a test be taken.

Reversed.